**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00240-BAH** |
| **v.** | : | |
| | : | |
| **LAWRENCE EARL STACKHOUSE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Lawrence Earl Stackhouse ("Stackhouse") to 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant, Lawrence Earl Stackhouse, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' of property damage.[1]

On February 4, 2022, Stackhouse pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 45 days of imprisonment with 36 months of probation, is appropriate in this

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.14. That amount reflets, among other things damages to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

case because Stackhouse: (1) admittedly observed violent clashes between U.S. Capitol Police Officers and rioters before entering the Capitol Building on January 6; (2) entered and remained in the Capitol building for approximately 20 minutes; (3) traveled throughout the Capitol, including through the Crypt and Rotunda, eventually reaching the Speaker of the House's Lobby and office suite, a sensitive location in the Capitol where entry is restricted even when the Capitol as a whole is open to the public; (4) admittedly entered the Speaker's Office suite after seeing and hearing the door being kicked in, even while the Speaker's terrified staffers sought shelter under their desks;  (5) blamed the police who sought to protect the Capitol on January 6 for "bringing violence on themselves";  (6) stated, in the immediate aftermath of the riot, "Don't regret one thing" and "Fuck the government," and (7) lied to Agents in a March 2020 interview by claiming that he was let in to the Capitol by police officers and did not see any windows or doors broken. The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, combined with the defendant's preparation for the January 6 riot, entry into the offices of the Speaker of the House of Representatives, apparent pride in having participated in the riot, and lack of candor in discussing his participation in the riot with the FBI, make a probation-only sentence unwarranted.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Stackhouse's Role in the January 6, 2021 Attack on the Capitol*

On December 28, 2020, Stackhouse and a friend, Michael Gianos, exchanged a number of text messages regarding the planned "Stop the Steal" rally scheduled to take place on January 6, 2021 in Washington, D.C.[2]   In those text messages, Stackhouse asked Gianos how he could join the Proud Boys and discussed the application process to join the Philadelphia chapter of the Proud Boys.  Gianos provided Stackhouse with a Proud Boys application, and stated that he would put in a good word for Stackhouse.  In reference to January 6, Gianos texted Stackhouse, "we're gonna be going after Antifa."  Stackhouse responded, "Full force."  Later in the conversation, Stackhouse texted, "Jan 6 is going to be awesome."   Gianos and Stackhouse made plans to travel to Washington, D.C. in anticipation of January 6, including which hotel to stay at.

Stackhouse drove to Washington, D.C. with a friend in the early morning hours of January 6 using a friend's car.  After arriving in Washington, D.C., Stackhouse and Gianos discussed where to meet to attend the "Stop the Steal" Rally.  Stackhouse attended the Stop the Steal Rally before making his way to the Capitol Building as part of a large group of protestors.  The U.S. Capitol

---

[2] Giannos was arrested on December 1, 2021 and has been charged with violations of 18 U.S.C. 1752(a)(1) and (2), and 40 U.S.C. 5104(e)(2)(D) and (G). *See United States v. Michael Giannos*, D.D.C. 1:22-CR-00074-JMC.

was first breached in this location, at the Senate Wing Doors, by a rioter who jumped through the window over the broken glass:



At approximately 2:22 p.m., approximately ten minutes after the entry depicted above, Stackhouse, Gianos, and another friend named Rachel Myers[3] entered the Capitol Building through the Senate Wing Doors.  Stackhouse, Gianos, and Myers walked past the broken windows and shattered glass into the Capitol Building.  The photograph below shows Stackhouse entering the Capitol Building through the Senate Wing Doors, wearing a Proud Boys hoodie.  There is broken glass from the broken windows to Stackhouse's left and right.

---

[3] Meyers was arrested on December 1, 2021 and has been charged with violations of 18 U.S.C. 1752. *See United States v. Rachel Myers*, D.D.C. 1:22-CR-00074-JMC.



Stackhouse, Gianos, and Myers walked through the U.S. Capitol to the Crypt, through the Memorial Door area, and then on to the Rotunda.







After milling through the Rotunda, Stackhouse, Gianos, and Myers walked through the hallway of the Speaker of the House's Lobby:



While in the hallway outside of the Speaker of the House's Office suite, Stackhouse saw and heard someone kick open the door to the Speaker of the House's Office suite.  Stackhouse

used this opportunity to get into the Office suite of the Speaker of the House.  In the below photos, an individual kicks open the door to the Speaker of the House's Office suite, and ten seconds later Stackhouse walks into the Speaker of the House's Office suite.





Stackhouse spent approximately 40 seconds inside the Speaker of the House's Office suite, before exiting and continuing on down the hallway.



Stackhouse eventually exited on the East side of the Capitol building. In total, Stackhouse spent approximately 20 minutes inside of the Capitol.

On January 7, Gianos texted Stackhouse, "Man so much crazy shit happened" in reference to the riot at the Capitol. Stackhouse responded, "Don't regret one thing" and "Fuck the government."

Stackhouse has admitted that he knew at the time he entered the Capitol building that he did not have permission to do so, and that he paraded, demonstrated, or picketed inside the Capitol Building.

*Stackhouse's Interview*

Stackhouse voluntarily agreed to an interview with the FBI at the time of his arrest on March 4, 2021. During the interview, Stackhouse stated that police officers opened the gates for the rioters and told them to come in. Stackhouse acknowledged that as he was walking up to the

Capitol building, after he went through the gates, he could see and hear "flash bangs" and "people being shot with stuff."   Stackhouse stated that before entering the Capitol building he was in a crowd of people chanting "stop the steal."   Stackhouse said that before entering the Capitol building he saw an individual with a flag on top of a wall, who fell about thirty feet. Stackhouse stated that when he got to the top of the steps prior to entering the Capitol building he turned around and saw the mass of people behind and below him.   Stackhouse stated that he could see people fighting with Capitol police officers, and that both sides brought it on themselves. Stackhouse stated he was standing outside of the doors to the Capitol building, and that he was chanting, "stop the steal."

Stackhouse falsely claimed that the Senate Wing Doors he entered through were opened by police officers, and that there were no broken doors and windows.  Surveillance photographs of Stackhouse entering the Capitol indicate that the doors and windows where Stackhouse entered were broken.

Stackhouse acknowledged going into Speaker of the House Nancy Pelosi's Office. Stackhouse stated that the doors to her office were shut, but he then heard the doors being kicked in and proceeded to go inside her office.  Stackhouse claims he did not touch anything once inside Speaker Pelosi's Office, and he left shortly afterwards.

Throughout the interview, Stackhouse falsely claimed that police officers opened the gates to the U.S. Capitol area, and the doors to the U.S. Capitol prior to the rioters getting inside. Stackhouse expressed remorse throughout the interview and stated that he realized he should not have gone inside, and that it was hypocritical of them to damage the U.S. Capitol building.

FBI Agents asked Stackhouse if he was part of any organized groups, such as the Proud Boys, Oath Keepers, or any militias. Stackhouse stated "no."  Stackhouse acknowledged wearing

a Proud Boys hoodie to the Capitol riot but stated he only bought it because the phrase "Trump 45" was written on the back in red, white, and blue.  Stackhouse stated he has no affiliation with the Proud Boys, that he has never spoken to anybody affiliated with the Proud Boys, and that he is not part of the Proud Boys whatsoever.

*The Charges and Plea Agreement*

On March 2, 2021, Lawrence Stackhouse was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On March 4, 2021, he was arrested at his place of employment in New Jersey. On March 22, 2021, Stackhouse was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 4, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating in a Capitol Building. By plea agreement, he agreed to pay $500 in restitution to the Department of the Treasury.  The government has previously briefed the restitution issue before this Court in relation to *United States v. Torrens*, 21-cr-204, ECF 99.  The numbers for restitution have slightly changed.  In response to the Court's request, the updated calculations on restitution are set forth as follows:

| | |
|---|---|
| Architect of the Capitol | $1,124,354.01 |
| House Chief Administrative Officer | $338,294.83 |
| Secretary of the Senate | $32,075.00 |
| Senate Sargent at Arms | $79,490.05 |
| Total | $1,574,213.89 |

Capitol Police:

| Lost and Damaged Property | $41,719.90 |
| Medical Payments | $73,719.55 |
| Continuation of Pay (COP)/Workers Compensation | $1,045,129.80 |
| Total | $1,160,569.25 |

### III.     Statutory Penalties

Stackhouse now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Stackhouse faces up to six months of imprisonment and a fine of up to $5,000. Stackhouse must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Stackhouse's individual conduct, this Court, in determining a fair and just sentence, should look to a spectrum of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Stackhouse personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or

destructive acts on Stackhouse's part  is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Stackhouse from most other misdemeanor defendants.

Stackhouse was expecting potential violence when he traveled to Washington, D.C.  In the days leading up to the riot, Stackhouse texted with Gianos regarding violence with Antifa.  When Stackhouse entered the Capitol Building, he had already seen extensive violence.  Stackhouse stated in great detail that he saw one rioter with a severely broken leg, he had seen tear gas, and he witnessed other violence.  Despite this, Stackhouse continued up the stairs to the Capitol building and went inside.  Stackhouse claims in his interview that there were no broken doors or windows, but, as shown in the surveillance photographs included above, the Senate Wing Doors and windows were broken prior to Stackhouse going through them at approximately 2:22 p.m., and there was broken glass on the floor of the building when Stackhouse entered.  Additionally, Stackhouse claims that there were too many people behind him in the crowd, so that he was forced to enter the Capitol building.  A few minutes later, however, Stackhouse stated that there were still people surging into the Capitol Building when he exited, but he still managed to get out.

While inside the Capitol building, Stackhouse witnessed violence and property destruction. Despite this, Stackhouse continued to make his way throughout the building. Stackhouse walked past Speaker Pelosi's office and did not enter because the door was closed.  Stackhouse then heard and saw the door to Speaker Pelosi's Office being kicked in.  Despite Stackhouse's claims to being opposed to violence and property destruction, Stackhouse went inside Speaker Pelosi's office.

Despite the remorse Stackhouse claimed to FBI Agents when interviewed after his arrest, Stackhouse did not display that remorse the day after the Capitol riot when texting with Michael Gianos.  There, he told Gianos that he regretted nothing, and added, "Fuck the government."

In Stackhouse's interview with FBI agents, he continually tried to minimize his involvement in the riot and with the Proud Boys.  Stackhouse stated unequivocally that he had no association with the Proud Boys, and that he did not know anybody in the Proud Boys.  These statements are in direct contradiction to his text messages with Gianos in the days leading up to the Capitol riot where Stackhouse is seeking out membership in the Proud Boys through Gianos.  Gianos even promises to put in a good word for Stackhouse.  Meanwhile, three months later, Stackhouse told the FBI that he had no association with the Proud Boys, and that he bought his Proud Boys hoodie simply because it said "Trump 45" in red, white, and blue on the back.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B.  Stackhouse's History and Characteristics

As set forth in the PSR, Stackhouse's criminal history consists of several traffic infractions, and two juvenile adjudications for burglary and drugs from 2002 and 2004. ECF 34 ¶¶ 28-32. Stackhouse reported to the PSR Officer that he has been employed in his current job since January 2022.  Stackhouse reports that he was previously employed from April 2011 through March 2021, but was fired on the day he was arrested for this offense.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

Oversight   and   Reform   Committee   (June   15,   2021),   available   at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Stackhouse's actions on January 6, and his comments before and after January 6, clearly demonstrate the need for specific deterrence for this defendant.  Stackhouse went to the stop the steal rally in Washington, D.C. anticipating violence with Antifa.  Stackhouse observed tear gas, injuries, and violence, and continued on into the Capitol Building.  Stackhouse observed the door to the office suite of the Speaker of the House being kicked in, and used it to his advantage.  The day after the Capitol riot Stackhouse showed no remorse, stating he does not regret a thing, and

"Fuck the government."  Even during Stackhouse's interview with FBI agents, he repeatedly minimize his involvement with the riot on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*,

---

[5]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors such as Stackhouse, merit serious consideration of incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Stackhouse has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made, whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider

not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on other January 6 defendant who engaged in similar conduct.  For instance, in *United States v. Blake Austin Reed,* (21-CR-204-BAH), this Court sentenced the defendant to 42 days of intermittent confinement and 36 months of probation.  Reed's aggravating factors included posting inflammatory comments on social media prior to January 6, discussing joining the Proud Boys, witnessing and filming rioters assaulting law enforcement outside of the Capitol and still entering, using protective gear, climbing a bike rack, traveling near the Speaker of the House Office, joined group of rioters outside of

House Chamber with members still inside, and concealed electronic evidence.  Although Reed was convicted under 18 U.S.C. § 1752(a)(1), his conduct of inflammatory statements leading up to January 6, witnessing violence outside the Capitol building, and going into protected areas was similar to Stackhouse's.  There are differences as well, including that Reed climbed a bike rack, concealed electronic evidence, and was with a group of rioters outside the House Chamber.

In *United States v. Andrew Ericson* (21-CR-506-TNM), Judge McFadden sentenced the defendant to 20 days intermittent incarceration.  Ericson's aggravating factors included penetrating the U.S. Capitol building all the way to the Speaker's conference room and office space, posing with his feet on the Speaker's conference room table, seeing police officers overrun by a crowd of rioters, recording his presence in and around the Capitol, and deleting his social media accounts. The similarities between Ericson and Stackhouse include both having gone into the Speaker's Office Suite and witnessing violence between officers and rioters.  Ericson posed inside of the Speaker's Conference Room, whereas Stackhouse only walked in and out of the Speaker's Office area.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

21

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

24

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a

prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of

imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[9]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in the defendant's case given the requested 20-day imprisonment sentence.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Stackhouse 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ April H. Ayers-Perez*
APRIL H. AYERS-PEREZ
TX Bar No. 24090975
Assistant United States Attorney
Detailee
U.S. Attorney's Office
11204 McPherson Road, Suite 100A
Laredo, TX 78045
Office: 956-754-0946
April.Ayers-Perez@usdoj.gov