**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  21-240 (BAH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWRENCE STACKHOUSE** | ) | |
| | ) | |
| | ) | |

---

## MEMORANDUM IN AID OF SENTENCING

*Where all think alike, no one thinks very much.*

*Walter Lippmann*

On March 4, 2021, Lawrence Stackhouse met with two FBI agents to discuss the events of January 6th.  He spoke to them without an attorney.  He consented to the search of his car.  He consented to the search of his phone.  Because of his cooperativeness, the FBI agent recommended that he be released.  During his interview, he explained that he, like many others, believed the propaganda – that former Vice President Mike Pence had the power to overturn the election.

That falsehood was advertised to and believed by millions and led thousands to travel to Washington, D.C., to "Stop the Steal."  Mr. Stackhouse, like the thousands of others, attended the rally and walked to the U.S. Capitol.  He had attended Trump rallies in the past, which he described as enjoyable events.  He expected and saw much of the same when he arrived in D.C.  He lent his voice to an important cause, which he only learned later was an imprudent one – Pence had no authority to overturn the election.

It was too late, the damage had been done.  He already traveled to D.C.  He already walked into the Capitol, dawning a "PB" shirt, which he picked because it had "Trump 45" and the red, white, and blue colors matched his bandana.  Worse of all, lives had been lost.  Hundreds of unsuspecting public servants and their families had been traumatized.  And, the pristine U.S. Capitol, a beacon of democracy, had been damaged in more ways than simply monetarily.

Lawrence Stackhouse regrets his decision to go the Capitol.  He regrets even consuming the propaganda and conspiracy theories heavily promoted on social media. The day after January 6th, he could still separate his actions from the

2

violence that others inflicted, and as a result stated in a text to his friend, that he "[did]n't regret one thing."  However, he soon realized that it did not matter whether he broke anything or assaulted anyone – he was wrong for his actions.  He told the FBI that he should not have been there.

He was fired from his job.  For months after January 6th, he could not find stable employment.  His poor decision to wear a "PB" shirt made people believe he was associated with the Proud Boys, of which he was never a part.  More than a year later, Mr. Stackhouse still finds it difficult remain steadily employed in light of his decisions on January 6th.

Mr. Stackhouse was not part of a militia group seeking to overthrow the government.  He did not encourage violence.  He cooperated with law enforcement thereafter, and has demonstrated remorse.  For these reasons, no incarceration should be imposed.  Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation, which would be a sentence not greater than necessary to address his conduct in this case.

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[1]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2]  The vitriol and antagonistic speech spread over the crowd of thousands. Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

**11 a.m.**          High-profile figures of the Republican Party spoke directing the Trump supporters:
- Representative Mo Brooks (R-Ala.) urged "American patriots" to **start taking down names and kicking ass**."[3]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[4]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican

---

[1]     Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2]     George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[3]     *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[4]     *Id*. (emphasis added).

lawmakers to challenge the election result and **"punch back from Donald Trump."**[5]

- Lara and Lawrence Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right.**"[6]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[7]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[8]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[9] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania |

---

[5]     *Id*. (emphasis added).

[6]     *Id*. (emphasis added).

[7]     *Id*. (emphasis added).

[8]     *Id*. (emphasis added).

[9]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

Avenue. **And we're going to the Capitol**, and we're going to try and give.[10]

By this time, his supporters started heading towards the Capitol and started fighting with the police.

**1:10 p.m.**                Supporters "begin grappling with police on the Capitol steps."[11]



**1:30 p.m.**                After Trump's speech, "supporters being marching toward the U.S. Capitol."[12]

---

[10]       *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[11]       Petras, *Timeline*, footnote 2 supra.
[12]       Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).

**2:11 p.m.**                Photographs indicate that supporters moved past the
                            police lines on the west side of the Capitol and others scale
                            the walls.[13]

- **Lawrence Stackhouse did not breach the
  perimeter or fight officers to get past the
  perimeter lines.**



**2:12-2:22 p.m.**[14]       During his FBI interview, Mr. Stackhouse described that
                            the police opened "the gates."  Below is screenshot from a
                            video online and provided in global discovery.[15]



---

[13]    Petras, *Timeline*, footnote 2 supra.
[14]    This is an estimated time based on subsequent events.
[15]    The video is available at https://www.youtube.com/watch?v=lX2gQsQElJY.

**2:12-2:22 p.m.**[16]      Mr. Stackhouse reaches the top of the steps before entering the Capitol.  He takes the photo below.
During his FBI interview, he described that there were clashes with police below this picture.  However, where he was, there were no clashes with officers.



Lawrence Stackhouse enters the Capitol through the Senate Wing doors.  At least 100, people entered through

---

[16]      This is an estimated time based on subsequent events.

**2:22 p.m.**                the doors and windows, which we open for at least 10 minutes by this time.



**2:24 p.m.**                Approximately two minutes later, Mr. Stackhouse follows the crowd through the Crypt.

**2:29 p.m.**            Mr. Stackhouse follows the crowd through the Memorial
                         Door.  During his FBI interview, he described that there
                         were cameras and the doors were open.  The picture below
                         shows someone[17] using a camera prior to him passing
                         through the open entry way.



**2:32 p.m.**            Mr. Stackhouse heads to the hallway of the Speaker's
                         Lobby.  Prior to him arriving, there appears to be another
                         camera man taking pictures as the crowd approaches.
                         During his FBI interview, he described that there were
                         cameras and he thought the groups were expected to enter.

                         The pictures below show photographers and the crowd
                         following a gentleman who appears to greet and lead the
                         crowd.

---

[17]        It is unclear whether the person hold the camera and the microphone behind him is a
journalist.





11









**2:32 p.m.**              Mr. Stackhouse walks down the hallway with the crowd.



                          Two minutes later, Mr. Stackhouse and others are quickly
**2:34 p.m.**             leaving in the direction they came down the hallway.

                          During his FBI interview, he described that he went into
                          the Speaker's Office Lobby after another man kicked in the
                          door.  He did not touch anything.  When he heard items
                          being broken, he left.



## **LEGAL PRINCIPLES**

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense," as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.

The United States Sentencing Guidelines do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner." *Id*. at 2 (B-D).  Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

**ARGUMENT**

Mr.  Stackhouse is a 33-year-old sheet metal worker from New Jersey.  While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive compared to others already sentenced for similar conduct.

## I.   Nature and Circumstances of Mr. Stackhouse's Offense

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage.  In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Stackhouse understands and would never minimize the impact of the event on the nation.  However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.

Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[18]  To characterize Mr. Stackhouse as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Stackhouse erroneously believed that Pence could overturn the election. He went along with the crowd.  On March 4, 2021, he had an interview with the FBI, without counsel.  He stated that he witnessed clashes between "two groups" they "brought it on themselves."  Leading up to that statement, he explained that one protestor fell approximately 30 feet and was severely injured.  A doctor in the crowd went to help the injured man.  Then, a Capitol police officer hit him in the back of the head with a "big metal thing."  He explained, that's when people started throwing things.  He was already near the doors of the Capitol and in the group he

---

[18]    *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

was in, there was no violence.  He then proceeded into the Capitol building.  He regretted that decision and told the FBI agents, "I shouldn't have been there."

During the interview, Mr. Stackhouse also stated that the officers opened the gates and the doors.  The government argues that Mr. Stackhouse lied when he made this statement;[19] however, some footage from January 6th showed what appeared to be gates being opened, as captured above. [20]  Footage also showed officers being overwhelmed by the crowd.  Areas that had been blocked by a few officers were open and crowds flowed in.  People in the middle or back of the crowd who later flowed into the open entryways may have erroneously believed that the doors had been opened for them.

While the footage of the carnage of that day has been and continues to be released, Mr. Stackhouse was not involved in conflicts with the police.  He was not the first to breach the perimeter and not the first to enter the Capitol.  Regardless of what led Mr. Stackhouse to the Capitol, it is clear that he did not engage in destructive or assaultive behavior inside the Capitol.  Nonetheless, Mr. Stackhouse has admitted guilt and is remorseful for his conduct.

## II.   Mr. Stackhouse's History and Characteristics

Lawrence Stackhouse had a stable childhood.  He grew up outside of Philadelphia in the suburbs.  His mother was a stay-at-home mother who babysat most of the kids in the neighborhood.  He maintains a close relationship with his family.

---

[19]     Gov't Sent. Memo, ECF No. 37, p. 10.
[20]     The video is available at https://www.youtube.com/watch?v=lX2gQsQElJY.

He played sports in school. ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ ██ ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ He is constantly focused on

whether he can put this case behind him and maintain employment so that he can

provide for himself.

**III.**     **<u>A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.</u>**

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for

the sentence imposed— . . . to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense."  Incarceration is

not required in order for a sentence to reflect the seriousness of the offense.  "A

sentence of probation rather than incarceration can work to promote the sentencing

goal of respect for the law by illustrating a rejection of the view that the law is

---

[21]     News Releases, National Institute of Health, *Mental health disorders common following mild head injury*, January 30, 2019, available at https://www.nih.gov/news-events/news-releases/mental-health-disorders-common-following-mild-head-injury

merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Stackhouse, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual.  Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities.  Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 296 inmates have died from COVID-19.[22]  With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

### IV.    A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Stackhouse.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."  The public has been protected while Mr. Stackhouse has been on pretrial release.  The public will be protected while Mr. Stackhouse is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those

---

[22] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed June 9, 2022).

who commit crimes," evidence suggests that lengthy prison sentences do not have a

"chastening" effect and "produce at best a very modest deterrent effect." *Five*

*Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

With respect to specific deterrence, research shows conclusively that "[t]he *certainty*

of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to

deter crime," and that "[i]ncreasing the severity of punishment does little to deter

crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many*

*Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ.

School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that

"across all offenders, prisons do not have a specific deterrent effect.  Custodial

sentences [jail and prison] do not reduce recidivism more than noncustodial

sanctions.").  No incarceration is needed to deter criminal conduct in this case.

## V.  Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Stackhouse to probation would not contribute to an

unwarranted sentencing disparity.  Approximately 171 defendants have been

sentenced in these cases.  Approximately 93% of the cases have been resolved as

misdemeanor offenses.  Of the misdemeanors cases, approximately 62.5% have been

sentenced to probation or home detention as a condition of probation.  January 6th

defendants in other cases who pled to the *exact* same federal charge received

probationary sentences with or without home detention.  *See United States v. Anna*

*Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months' probation); *United*

*States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation); *United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim. No. 21-cr-0355 (5 years' probation); *United States v. Andrew Wrigley*, Crim. No. 21-cr-42 (18 months' probation); *United States v. James Lollis*, Crim. No. 21-cr-671 (3 months' home detention and 36 months' probation); *United States v. Jack Griffith*, Crim. No. 21-cr-204 (3 months' home detention and 36 months' probation).

The government cites several cases to justify its requested sentence, including the case of *United States v. Blake Austin Reed,* Crim. No. 21-cr-204-BAH, where this Honorable Court sentenced the defendant to 42 days of intermittent confinement.  See ECF No. 37, p. 20.  There are several differences between Mr. Reed's case and this case.  First, Mr. Reed pled guilty to a misdemeanor which carries a higher maximum penalty, unlike Mr. Stackhouse.

Second, in that case, unlike here, Mr. Reed was actually inches away from the protestors who clashed with law enforcement.  To quote the government in that case, "One of the tear gas canisters landed near him and a member of the crowd yelled for someone to throw it back at the Capitol. …Instead of leaving, he continued participating in the riot." *Reed*, Crim. No. 21-cr-204, Gov't Sent. Mem., ECF No. 171, pp 13-14.  Here, Mr. Stackhouse described seeing clashes between police and protestors from a further distance and when he was already close to entering the Capitol building.  There were no clashes immediately around him.  As

22

soon as he heard things breaking inside, which was approximately 15 minutes after he entered the building, he headed towards the exit.

Third, Mr. Reed made light of what law enforcement obtained after searching his residence.  Here, Mr. Stackhouse consented to an interview with the FBI and was courteous and respectful.

The government also focuses on the fact that Mr. Stackhouse walked in and walked out of the Speaker's Office area within 40 seconds.  As stated above, Mr. Stackhouse admits that he was wrong for all of his conduct.  That conduct should not be a basis for incarceration.  His conduct is very different from the case of *United States v. Adam Johnson*, Crim. No. 21-cr-648.  In that case, Mr. Johnson not only took Nancy Pelosi's lectern, he proudly displayed the lectern and posed for pictures with it.  By contrast, Mr. Stackhouse did not take memorabilia or take anything from members of Congress.

As laid out in great detail above, Mr. Stackhouse was not proud of his conduct and continues to suffer the consequences of his actions.  He has accepted responsibility and remains very remorseful.

## **Conclusion**

Considering the § 3553(a) sentencing factors, a probationary sentence with a condition of home detention, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

24